## APPEAL OF WEST END CONSOLIDATED MINING CO.

Docket No. 2172.    Submitted August 29, 1925.    Decided November 24, 1925.

> 1. Where tangible property is paid in for stock prior to January 1, 1914, the basis for computing invested capital under section 207 of the Revenue Act of 1917 is actual cash value of such property as of January 1, 1914, even though the January 1, 1914, value is less than the value of the property at the time of acquisition.
> 2. The fact that the January 1, 1914, value to be used in computing invested capital is much less than the value at the time of acquisition is not a ground for special relief under the provisions of section 210 of the Revenue Act of 1917.
> 3. Costs incurred in defending title to property, *held* capital expenditures.

*M. L. McLaren, C. P. A., George Naus, Esq.*, and *Louis Bennett, Esq.*, for the taxpayer.
*John D. Foley, Esq.*, for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

This is an appeal from the determination of a deficiency of $60,-607.01 income and profits taxes for 1917, of which approximately $50,000 is in controversy.

### FINDINGS OF FACT.

The taxpayer was incorporated May 5, 1906, under the laws of the State of Arizona, with a capital stock of 2,000,000 shares of a par value of $5 each, for the purpose of consolidating three companies operating mines in the Tonopah District of Nevada.

On June 27, 1906, it acquired by deed all the property of the Tonopah Extension Milling & Mining Co. and assumed the obligations of that company. It issued in exchange therefor 1,000,000 shares of its capital stock. The property so acquired had an actual cash value of $1,800,000 at the date of acquisition.

On October 27, 1906, the taxpayer acquired by deed the Tonopah properties of the Ohio Tonopah Mining Co. and issued therefor 200,000 shares of its capital stock. The property so acquired by the taxpayer had an actual cash value of $300,000 at the date of acquisition.

On November 5, 1906, taxpayer acquired a one-half interest in the Porcupine Fraction claim and issued therefor 3,000 shares of its capital stock.

Between July 31, 1906, and January 31, 1907, taxpayer acquired 193,850 shares of the capital stock of McNamara Mining Co., which had an actual cash value at date of acquisition of $155,160, and issued therefor 95,572 shares of its own stock. This stock was disposed of prior to 1917 and other property acquired in its stead.

On or about July 6, 1911, taxpayer purchased from F. M. Smith, one of its directors, 185,865 shares of the capital stock of the Halifax Tonopah Mining Co., giving therefor its note for $190,160.86, with the option to said Smith of taking taxpayer's stock at the rate of 50 cents per share, at any time within a period of three years, in payment of said note, or taking cash therefor, as he might decide. On or about February 29, 1912, said Smith elected to take stock of the taxpayer, whereupon 395,027 shares of the capital stock of taxpayer were issued to said Smith in payment of said note and interest, amounting in all to $197,513.71.

On or about April 30, 1912, taxpayer purchased a one-sixteenth interest in the Santa Rosa Mine and issued therefor 1,887 shares of its capital stock.

Upon the purchase of the property of the Tonopah Extension Milling & Mining Co., taxpayer received a deed to such property, the consideration being 1,000,000 shares of taxpayer's capital stock, as hereinbefore set forth. Taxpayer's stock, instead of being issued to the Tonopah Extension Milling & Mining Co., was issued by the taxpayer directly to the stockholders of that company. A number of the smaller stockholders could not be located and taxpayer issued to itself, as trustee for such stockholders, 13,325 shares of its capital stock. Dividends declared by the taxpayer have regularly been set aside in a special trust fund for the benefit of such stockholders.

In computing invested capital the Commissioner used the January 1, 1914, value of taxpayer's properties, computed at $671,873.83, from which he deducted depletion sustained to December 31, 1916, in the sum of $329,487, leaving a balance of $342,386.83, to which there was added a surplus of $752,409.54, making taxpayer's total invested capital $1,094,796.37.

During the years 1914 to 1918, inclusive, taxpayer was engaged in a suit over its right to mine certain veins. The suit was brought by the Jim Butler Tonopah Mining Co., as plaintiff, against the taxpayer, as defendant, and was carried to the Supreme Court of the United States, resulting in a judgment for the taxpayer. 247 U. S. 450. The suit was brought to enjoin taxpayer from exercising an asserted extralateral right in respect of a vein of ore ex-

tending beneath the surface from taxpayer's claim into plaintiff's claim. The questions involved were:

(1) Whether the vein in question apexed on the taxpayer's land;

(2) Whether the vein in question passed through the side lines or end lines of taxpayer's claim; and

(3) Whether, where there are two or more veins apexing in one claim, the owner of such claim under a claim of extralateral rights can follow more than the vein originally discovered?

The suit resulted in a complete victory for the defendant, sustaining its right to mine a vein which apexed on its property but extended downward and beyond the side line of its claim. In connection with such suit the taxpayer expended, from 1914 to 1916, $79,469.35 in preparing for such suit, as well as other sums for counsel fees. In computing invested capital the Commissioner capitalized the expenditures for counsel fees, but failed to capitalize the expenditure of $79,469.35.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 15 days' notice, under Rule 50.

### OPINION.

PHILLIPS: All expenses incurred in connection with the suit to defend its right to mine the vein apexing on its property are properly to be capitalized. *Appeal of Consolidated Mutual Oil Co.*, 2 B. T. A. 1067. The surplus and invested capital should be increased accordingly.

Section 207 of the Revenue Act of 1917 provides:

SEC. 207. That as used in this title, the term "invested capital" * * * means * * *

(a) In case of a corporation or partnership; * * * (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment (*but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor*). * * * (Italics ours.)

It is undisputed that tangible property was paid in for stock of the taxpayer long prior to January 1, 1914, and that this property had a greater value at the time it was paid in than it had on January 1, 1914. It is also undisputed that the actual cash value of the property paid in did not exceed the par value of the original stock specifically issued therefor. The question is presented whether, in such a case, the actual cash value at the time the property was paid in can be used, or whether the taxpayer is restricted to the lesser value of January 1, 1914. Taxpayer urges that the clause relating

to the January 1, 1914, value is a relief measure, and was not intended as a restriction, and that, when applied to the taxpayer, it works a hardship and not a relief. We are asked to examine into the legislative history of the section for the purpose of interpretation. Such legislative history, even though we may consider it available for the purpose of interpreting language which appears unambiguous, does not furnish much light. The clause which has been italicized in the above quotation was first inserted into the draft of the Revenue Act of 1917 by the conferees of the Senate and House after the bill, with various differences, had passed both Houses of Congress. The report made to the House of Representatives by its members on the Conference Committee reads, with reference to section 207:

The House bill levied an excess-profits tax in addition to the excess-profits tax now upon the statute books of 8 per cent upon the net income of corporations and partnerships in excess of 8 per cent of the capital actually invested, and an additional exemption of $5,000. The Senate struck out the House provision and substituted therefor a war-profits tax providing graduated rates, ranging from 12 to 60 per cent upon incomes of corporations, partnerships, and individuals in excess of their respective average incomes during the years 1911, 1912, and 1913. The Senate provision, however, limited the exemption to an amount not less than 6 nor more than 10 per cent of the actual capital invested.

The Senate provision also provided that if the exemption on the basis of the prewar period (the average income for the years 1911, 1912, and 1913) allowed corporations, partnerships, and individuals in any individual case did not represent the deductions allowed representative concerns engaged in similar businesses, that the Secretary of the Treasury could allow an exemption in such cases equal to the same proportion of their net income for the taxable year that the deduction granted representative concerns was of the net income for the taxable year of such concerns, provided that the exemption granted should not be less than 6 nor more than 10 per cent of the actual capital invested.

The House recedes from its disagreement to this amendment with an amendment levying an excess-profits tax upon the excess profits of corporations, partnerships, and individuals ranging from 20 to 60 per cent. In arriving at the excess profits, an exemption from the net income as shown by the income-tax returns of not less than 7 nor more than 9 per cent of the actual capital invested is to be allowed. In addition to this exemption, all domestic partnerships and citizens or residents of the United States are to be allowed a flat exemption of $6,000 and all domestic corporations a flat exemption of $3,000.

It is to be noted that no reference is made by the House to the clause relative to January 1, 1914, value. The report to the Senate merely sets out the changes and gives no exposition of the reasons.

The report of the Conference Committee passed both Houses with little debate. On the floor of the Senate, Senator Simmons, chairman of the Senate Finance Committee and in charge of the bill, said:

Mr. President, before leaving the subject of the excess-profits tax I wish to say that before agreeing to the amendment made in the conference changing

the maximum and minimum prewar exemptions as fixed by the Senate from 6 to 10 per cent to 7 and 9 per cent, your conferees insisted that if these changes were made, there should be a liberalization of the definition of capital as contained in the bill as it passed both the House and the Senate. That definition, as you will recall, provided in substance that tangible property paid in in the place of cash for stock or shares in a corporation should be valued as at the time of payment. This part of the definition was qualified so as to provide that in case such tangible property was paid in before January 1, 1914, it should be valued at its actual cash value as of January 1, 1914, not to exceed the par value of the stock or shares specifically issued therefor.

In the debate on the floor of the House, Representative Kitchen, chairman of the House Ways and Means Committee and in charge of the bill, stated, in answer to a question:

We have agreed on a definition as to invested capital substantially as the House had it with some modifications as to good will and other intangible assets. We also provide that property turned over for shares and stock in a corporation or partnership prior to January 1st, 1914, to be valued at its cash value not as of the time it was turned over, but as of January 1st, 1914. All property turned over since January 1st, 1914, is valued at its cash value at the time so turned over.

We have before us the language of the statute which appears clear and unambiguous, together with the statements of the persons responsible for the bill before each House of Congress. The statement in the Senate is to the effect that the provision for the January 1, 1914, valuation was to work a liberalization of the definition of capital. On the other hand, a statement before the House is that, as to property paid in prior to January 1, 1914, the value is to be that of January 1, 1914, and not the value when paid in. It is true, as urged by counsel for the taxpayer, that the Revenue Act of 1917 was hastily drawn and passed without great consideration of its details. Even so, we do not consider that we would be justified in accepting the statement made on the floor of the Senate against the plain wording of the law and the equally authoritative statement made on the floor of the House.

Taxpayer further alleges that the Commissioner has not permitted it to include anything in invested capital on account of the stock issued to itself as trustee for certain unlocated stockholders of a company whose assets were purchased by the taxpayer. The record is not sufficient to indicate whether the January 1, 1914, value has been reduced because of this circumstance. If so, the amount by which it has been reduced should be restored to invested capital.

Taxpayer urges that, if its tax is to be computed upon the January 1, 1914, value, it is entitled to relief under section 210 of the Revenue Act of 1917, which provides as follows:

SEC. 210. *That if the Secretary of the Treasury is unable in any case satisfactorily to determine the invested capital,* the amount of the deduction shall be the sum of (1) an amount equal to the same proportion of the net income of

the trade or business received during the taxable year as the proportion which the average deduction  *  *  *  for the same calendar year of representative corporations, partnerships, and individuals, engaged in a like or similar trade or business, bears to the total net income of the trade or business received by such corporations  *  *  *.  (Italics ours.)

This section provides only one ground for special relief, namely, "if the Secretary of the Treasury is unable satisfactorily to determine the invested capital." The invested capital of the taxpayer, based on the January 1, 1914, value of its assets, has been determined and was not attacked upon the hearing before the Board. There is nothing in the history relating to this section to which our attention has been called, or which we have been able to find, which would extend the scope of this section beyond its words. It is true, as pointed out by counsel for the taxpayer, that the Commissioner found it impracticable to follow the section literally and laid down regulations which broadened its scope, and that this was done with the implied consent of Congress, but the taxpayer has not, in our opinion, brought itself within any of the classes mentioned within the regulations. Whether it would be entitled to special relief under the broader provisions of the Revenue Act of 1918, we are not called upon to decide.